# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

vs.                                           Case No.:    3:09-cr-322-J-32PDB

DANIEL VIGIL

_____/

## **ORDER**

This case is before the Court on Defendant Daniel Vigil's Letter Motion for Compassionate Release (Doc. 111), and counseled Supplemental Motion (Doc. 118). Defendant is incarcerated at Forrest City Medium FCI, where he is serving a 156-month term of imprisonment for two counts of bank robbery and violating the conditions of supervised release. (Doc. 73, Judgment); United States v. Vigil, No. 3:09-cr-12-J-32JRK, Dkt. Entry 43, Judgment of Revocation. According to the Bureau of Prisons (BOP), he is scheduled to be released from prison on June 14, 2022. Defendant is 62 years old and requires the assistance of a wheelchair because of knee problems. In addition, he suffers from diabetes, high blood pressure, hepatitis, and back problems. (Doc. 111; Doc. 118 at 1, 19-21 & n.8). Defendant fears that his myriad ailments render him especially susceptible to Covid-19. As a result, he seeks early release under the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A).

1

The United States opposes the motion because it argues that Defendant has not exhausted his administrative remedies, because he has not shown extraordinary and compelling reasons for compassionate release, because Defendant is a danger to the community, and because the § 3553(a) sentencing factors do not support early release. (Doc. 119). For the reasons below, the Court finds that Defendant should be granted compassionate release.

## I.      Compassionate Release

Ordinarily, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). However, as amended by the First Step Act of 2018, § 3582(c) provides in relevant part:

> **(A)**   the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> > **(i)**   extraordinary and compelling reasons warrant such a reduction …
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A).

Pursuant to its authority under 18 U.S.C. § 3582(c) and 28 U.S.C. § 994(t), the United States Sentencing Commission has promulgated a policy statement governing the circumstances when compassionate release is appropriate. See U.S.S.G. § 1B1.13. The policy statement provides:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
> **(1)**   **(A)** Extraordinary and compelling reasons warrant the reduction; or
> **(B)** The defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;
>
> **(2)** The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> **(3)** The reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13. The Sentencing Commission has not updated the policy statement since Congress passed the First Step Act.

The guideline's commentary defines "extraordinary and compelling reasons" to mean a defendant's medical condition, age, family circumstances, or "other reasons" as determined by the Director of BOP. U.S.S.G. § 1B1.13, cmt. 1. As relevant here, these circumstances include:

**(A) Medical Condition of the Defendant.—**

**(i)** The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

**(ii)** The defendant is--

**(I)** suffering from a serious physical or medical condition,

**(II)** suffering from a serious functional or cognitive impairment,

or

**(III)** experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

…

**(D) Other Reasons.--** As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

Id., cmt. 1(A), 1(D).

When a defendant moves for compassionate release on his own behalf, the statute contains an exhaustion requirement. A district court can reduce the term of imprisonment "upon motion of the defendant" only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf <u>or</u> the lapse of 30 days

from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A) (emphasis added). The statute

> does not contain an exhaustion requirement in the traditional sense. That is, the statute does not necessarily require the moving defendant to fully litigate his claim before the agency (i.e., the BOP) before bringing his petition to court. Rather, it requires the defendant either to exhaust administrative remedies or simply to wait 30 days after serving his petition on the warden of his facility before filing a motion in court.

United States v. Haney, --- F. Supp. 3d ---, 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020) (emphasis in original); see also United States v. Alam, 960 F.3d 831, 834 (6th Cir. 2020) ("Prisoners who seek compassionate release have the option to take their claim to federal court within 30 days [of submitting a request to the warden], no matter the appeals available to them.").[1] The exhaustion requirement is a mandatory claim-processing rule, which a district court must enforce if it is invoked. See Alam, 960 F.3d at 833-34; United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020). But the exhaustion requirement is non-jurisdictional as well. Alam, 960 F.3d at 833.

A movant for compassionate release bears the burden of proving that a reduction in sentence is warranted. United States v. Heromin, No. 8:11-cr-550-

---

[1]     The courts in Haney and Alam appear to represent the majority view on the meaning of the 30-day exhaustion alternative, meaning a defendant may file a motion for compassionate release in district court so long as he has waited at least 30 days after submitting a request for compassionate release to the warden of his facility. Notably, the Department of Justice has adopted this view as well. (See Doc. 118 at 5 n.4) (collecting cases).

T-33SPF, 2019 WL 2411311, at \*2 (M.D. Fla. Jun. 7, 2019); cf. United States v. Hamilton, 715 F.3d 328, 337 (11th Cir. 2013) (a movant under § 3582(c)(2) bears the burden of proving that a sentence reduction is appropriate).

## II.   Defendant has satisfied the exhaustion requirement

The United States argues that Defendant has failed to satisfy § 3582(c)(1)(A)'s exhaustion requirement, but the Court disagrees. Defendant has attempted at least three times to obtain compassionate release through the BOP's administrative process. The second and third attempts satisfy the statutory requirement that a defendant submit a request for compassionate release to the warden and give the BOP at least 30 days to act. See 18 U.S.C. § 3582(c)(1)(A).

First, Defendant submitted an unsuccessful request for compassionate release on March 4, 2020, but the request was returned to him on April 2, 2020 because it did not comply with BOP Program Statement 5050.50. (Doc. 119 at 4-5). Defendant did not resubmit the request after it was returned to him in April. (Id.). Then, on May 10, 2020, Defendant's sister, Rita Behnke, submitted a second request for compassionate release on Defendant's behalf to the warden of his facility. (Doc. 119-1). BOP protocol allows third parties, such as family members, to submit a request for compassionate release on behalf of an inmate. 28 C.F.R. § 571.61(b). However, for reasons unknown, Ms. Behnke's request was

not stamped as "received" by the warden until a month and a half later, on June 25, 2020. (Doc. 119-1). Coincidentally, that is the same date the Assistant United States Attorney reached out to Defendant's unit team to confirm Defendant's record of administrative remedy requests. (Doc. 119 at 4). The government has not explained the one-and-a-half-month delay between when Ms. Behnke sent the request and when the warden marked the request "received." Notably, around the same time that Ms. Behnke sent the request to the warden, she sent a letter motion to this Court (dated May 14, 2020), which the Court received the very next day (on May 15, 2020). (See Doc. 111). Thus, it does not appear that the delay was attributable to Ms. Behnke or the postal service. Third, the record further shows that Defendant submitted his own request for compassionate release to the warden on June 1, 2020 – well over 30 days ago. (Doc. 118-5, BP-8 Form).

On June 30, 2020, the Court instructed Defendant to advise the Court whether the BOP had acted on any of his requests for compassionate release. (Doc. 120). On July 8, 2020, Defendant advised the Court that the BOP still had not acted on any of Defendant's applications. (Doc. 121).

Ms. Behnke's request for compassionate release, submitted on May 10, 2020, satisfies § 3582(c)(1)(A)'s exhaustion requirement. Although the warden did not stamp Ms. Behnke's request as "received" until June 25, 2020, the record suggests that this delay was through no fault of Ms. Behnke's. Moreover, the

Court agrees that the "30-day period should be measured from the date on which a prisoner submits his or her request to the BOP, not the date the request is received by the Warden." United States v. Feucht, --- F. Supp. 3d ---, 2020 WL 2781600, at *2 (S.D. Fla. May 28, 2020); see also United States v. Resnick, --- F. Supp. 3d ---, 2020 WL 1651508, at *6 (S.D.N.Y. Apr. 2, 2020). This principle follows by analogy from the "prison mailbox rule," which provides that a pro se inmate's legal submission is considered filed on the date it is delivered to prison authorities for mailing rather than the date it is filed with the court. Jeffries v. United States, 748 F.3d 1310, 1314 (11th Cir. 2014) (citing United States v. Glover, 686 F.3d 1203, 1205 (11th Cir. 2012)). The analogy is imperfect; nevertheless, many of the same reasons behind the rule remain applicable. Inmates (or their family members) "are not typically handed the keys of the warden's office so they can place their applications for compassionate release on the warden's desk." Resnick, 2020 WL 1651508, at *6. Instead, "a prisoner necessarily loses control of his filing when he delivers it to prison authorities." Jeffries, 748 F.3d at 1314 (citing Houston v. Lack, 487 U.S. 266, 275 (1988)). A pro se inmate, or an unrepresented family member, also lacks various safeguards to ensure timely filing, such as the ability "to file personally in the [warden's] office" or "counsel to monitor the filing process." Garvey v. Vaughn, 993 F.2d 776, 780 (11th Cir. 1993). Rather, "the prisoner must 'entrust his court filings to prison authorities over whom he has no control.'" Feucht, 2020 WL

2781600, at *2 (quoting <u>Garvey</u>, 993 F.2d at 780). Thus, the Court finds that the prison mailbox rule applies in this context as well.

It is reasonable to assume that Ms. Behnke's request for compassionate release would have taken some time to reach FCI Forrest City Medium, but no more than five days from when she sent it on May 10, 2020.[2] Thus, the third-party request for compassionate release has been pending since May 15, 2020 at the latest. Defendant filed the Supplemental Motion for Compassionate Release 31 days later, on June 15, 2020. (Doc. 118). Accordingly, the Court finds that Defendant has satisfied the exhaustion requirement based on Ms. Behnke's third-party application for compassionate release.[3]

Alternatively, Defendant satisfied the exhaustion requirement based on his third and latest request, which he submitted on June 1, 2020. (Doc. 118-5). The government argues that exhaustion is "premature" because, as of the date it responded to the motions for compassionate release (June 29, 2020), fewer than 30 days had passed. As of today, however, more than 30 days have passed

---

[2]   The Court again notes that it took only one day for Ms. Behnke's letter motion to reach this Court, which she sent around the same time that she sent the request to the warden of FCI Forrest City Medium

[3]   The government argues that Ms. Behnke's request is defective because it does not comply with BOP Program Statement 5050.50. The Court believes it is up to BOP, not the Assistant United States Attorney, to determine whether the administrative remedy request complies with the BOP's protocols. Based on the current record, neither the BOP nor the warden has made that determination because there has been no response to the request.

since Defendant submitted the request, and the BOP still has not acted on it. (See Doc. 121). Therefore, the Court finds that Defendant's June 1, 2020 application for compassionate release also satisfies § 3582(c)(1)(A)'s exhaustion requirement.[4] Because the Court finds that Defendant has satisfied the statute's exhaustion requirement, it will move on to the merits.

## III.   Defendant Has Shown Extraordinary and Compelling Reasons

The Covid-19 pandemic poses a threat to public health with few precedents in modern memory. That threat is especially grave for prisoners. Unlike members of the general public, inmates are confined in close quarters with hundreds of other people under conditions that are usually not conducive to proper sanitation or hygiene. "Public officials have long warned that the nation's correctional facilities would most likely become vectors in the pandemic

---

[4]      It is not clear when the compassionate release statute's exhaustion requirement must be satisfied: (1) before the defendant files the motion in the district court or (2) before the district court can grant relief (even if the defendant filed the motion before meeting the exhaustion requirement). See 18 U.S.C. § 3582(c)(1)(A). It is possible to read the statute either way. The government seems to argue that the exhaustion requirement must be satisfied before the district court can grant relief (see Doc. 119 at 4-7), in which case Defendant has satisfied the 30-day waiting period. But even if a defendant must satisfy the exhaustion requirement before filing the motion, Defendant has met that requirement as well. As discussed above, Defendant filed the Supplemental Motion for Compassionate Release more than 30 days after his sister submitted a request for compassionate release to the Warden. Alternatively, if the 30-day waiting period is measured from when Defendant filed his third request on June 1, 2020, the Court construes Defendant's response of July 8, 2020 (Doc. 121) as a renewal of the motion for compassionate release.

because they are often overcrowded, unsanitary places where social distancing is impractical, bathrooms and day rooms are shared by hundreds of inmates, and access to cleaning supplies is tightly controlled." <u>Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide</u>, available at https://www.nytimes.com/2020/06/16/us/coronavirus-inmates-prisons-jails.html. Since then, prisons have become hotspots for Covid-19 infections: "the five largest known clusters of the virus in the United States are not at nursing homes or meatpacking plants, but inside corrections institutions." <u>Id.</u> That said, the Court agrees with the Third Circuit Court of Appeals that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." <u>Raia</u>, 954 F.3d at 597.

However, Covid-19 can create extraordinary and compelling circumstances for an inmate who suffers from underlying medical conditions recognized by the Centers for Disease Control (CDC) as a risk factor for severe infection.

> A court could find that [a] defendant's medical condition, heightened by risks posed by COVID-19, "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility" and is one "from which he or she is not expected to recover," i.e. a chronic condition. [U.S.S.G.] § 1B1.13 n.1(A)(ii).

11

United States v. Bolze, — F. Supp. 3d —, 2020 WL 2521273, at *7 (E.D. Tenn. May 13, 2020). A few months ago, "the Department of Justice adopted the position that any inmate who suffers from the chronic conditions associated with severe illness from COVID-19 are eligible for compassionate release." Wise v. United States, No. ELH-18-72, 2020 WL 2614816, at *7 (D. Md. May 22, 2020). In one recent case, the government conceded – and the district court agreed – "that the risk of COVID-19 presents 'a serious physical or medical condition … that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility'" because the defendant's comorbidities rendered him "less able to protect himself against an unfavorable outcome from the disease." United States v. Pabon, — F. Supp. 3d —, 2020 WL 2112265, at *3 (E.D. Pa. 2020).

Defendant, who is 62, has provided medical records documenting that he suffers from several medical conditions associated with severe infection from coronavirus. These conditions include viral hepatitis B, viral hepatitis C, Type 2 Diabetes Mellitus, and hypertension. (Doc. 118-6, Medical Records). The CDC states that liver disease (which includes hepatitis) may increase the risk for severe infection from Covid-19. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. Likewise, the CDC states that hypertension might also increase the risk of serious illness. Id. Furthermore, the CDC states that Type 2 Diabetes Mellitus does increase the

risk of severe infection. Id. According to one recent study, one in ten Covid-19 hospital patients with diabetes died from the virus. https://www.cnn.com /2020/05/29/health/diabetes-study-covid-19-deaths/index.html. Indeed, the Department of Justice (DOJ) recently took the position before the Seventh Circuit Court of Appeals that, in light of the Covid-19 pandemic, a diabetic prisoner had shown that he suffered from a serious medical condition that substantially diminished his ability to provide self-care within the prison environment, such that he had demonstrated extraordinary and compelling reasons for compassionate release. See United States' Unopposed Motion for Remand, United States v. Garcia, No. 20-1716 (7th Cir.), Dkt. No. 9 at 7-8; see also Reply in Support of Application for Stay, Williams v. Wilson, No. 19A1047, at 18 n.4 (Jun. 4, 2020).

In addition, Defendant is confined to a wheelchair because of knee and back problems. (Doc. 118 at 4, 19 n.8, 21). The medical records show that, on top of his other medical conditions, Defendant suffers from scoliosis and bilateral knee problems. (Doc. 118-6 at 18-27). One doctor's note states: "This man really needs bilateral [total knee arthroplasties] as he already has a varus deformity on the [right knee] and a valgus deformity on the [left knee]." (Id. at 18; see also id. at 21). Another report states that Defendant has "[s]evere diffuse congenital spinal canal stenosis of the lumbar spine," including "advanced discogenic degenerative changes" at the L2-L3 vertebrae. (Id. at 22). There is

no indication that Defendant will fully recover from these impairments, at least as long as he is in prison.

It is difficult enough for inmates to protect themselves from Covid-19 under the conditions of the prison environment. But that task is even harder where an inmate is older and dependent on a wheelchair. And, the potential consequences of the defendant's diminished ability to care for himself are amplified where the defendant suffers from multiple underlying medical conditions – like diabetes, high blood pressure, and hepatitis B and C – that increase his risk of death from Covid-19. Accordingly, Defendant has shown the existence of extraordinary and compelling reasons for compassionate release. See U.S.S.G. § 1B1.13, cmt. 1(A)(ii).

The Court also notes that, according to BOP data, 49 inmates and 15 staff members at Forrest City FCI Medium are currently diagnosed with Covid-19.[5] Additionally, Forrest City Medium's companion facility, Forrest City Low, is one of the BOP facilities worst affected by Covid-19: while only two inmates and 10 staff members are currently positive for Covid-19, 650 inmates and four staff members have reportedly recovered. Thus, that coronavirus could infiltrate Defendant's facility is more than a hypothetical possibility. While the Court recognizes that the number of cases at Forrest City Medium is limited, it need

---

[5]    https://www.bop.gov/coronavirus/. The numbers are updated daily.

not wait until the virus has overwhelmed the facility before acting.

## IV.   Defendant Will Not Be a Danger to the Community and the § 3553(a) Factors Weigh in Favor of Compassionate Release

Although the Court finds that Defendant has established the existence of extraordinary and compelling circumstances, that does not end the analysis. The Court must also determine that "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," U.S.S.G. § 1B1.13(2), and it must consider the § 3553(a) sentencing factors, 18 U.S.C. § 3582(c)(1)(A).

First, Defendant is not a current danger to the safety of another person or to the community. The Court considers such factors as "the nature and circumstances of the offense charged," "the weight of the evidence against the person," the "history and characteristics of the person," including the person's "mental and physical condition," as well as "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). To be sure, Defendant's crimes of conviction were serious: he pleaded guilty to two counts of bank robbery, in violation of 18 U.S.C. § 2113(a), and he was also convicted of violating the conditions of supervised release. (See Doc. 73). But several factors support the idea that, if released, he likely will not pose a continuing threat to the public.

There is no doubt that Defendant has a serious criminal history and that he was a repeat bank robber. Bank robbery is a serious offense because it involves at least the threat of force. In re Sams, 830 F.3d 1234, 1239 (11th Cir. 2016). Indeed, the 2002 conviction underlying his supervised release violation in Case No. 3:09-cr-12 involved the use of a firearm to rob a bank. (See Presentence Investigation Report [PSR] at ¶ 54). While the 2002 bank robbery involved a firearm, the two bank robbery offenses to which he pleaded guilty in the instant case did not. Defendant pleaded guilty to both crimes and accepted responsibility. Defendant was remorseful for the offenses and said he was "embarrassed of his actions." PSR at ¶ 21.

In the past, Defendant has struggled with depression, bipolar disorder, and substance abuse, and he has maintained that the crimes were fueled by a need to support his drug habit. (See Doc. 42 at 3, 5; see also PSR at ¶¶ 21, 75-88). But during the past 11 years in state or federal custody, Defendant has completed drug education treatment and enrolled in the residential drug treatment program. (Doc. 118 at 4; Doc. 118-4, Def. Ex. D). Defendant reports that he self-enrolled in Narcotics Anonymous and Alcoholics Anonymous, and that he has been sober for 11 years. (Doc. 118 at 4; Doc. 121-1, Letter to Court). Additionally, when Dr. Harry Krop performed a competency evaluation in October 2010, he reported that Defendant was on an effective medication regimen that stabilized his mood and reduced the symptoms of bipolar disorder.

(Doc. 42 at 6; PSR at ¶ 79). Therefore, the circumstances that drove Defendant to offend in the past seem to have improved, such that Defendant is less likely to reoffend in the future.

Defendant also wrote a letter to this Court regarding his past conduct and how he has grown in prison. (Doc. 121-1). Defendant states that, while incarcerated, he has reflected on his conduct and gained greater appreciation for how it affected the victims and his family members. Defendant says that he was "shocked at who I had become." (Id.). He is remorseful for his actions and wishes to do better. Defendant concludes:

> The changes in my life have come from a lot of pain and a lot of hard work. I realize words are just words unless they are backed up by my actions. I have learned to take responsibility for my actions and own up to my mistakes. Today I regret the decisions I made and my actions. I know I gave up my family, my home, my job and my freedom for drugs. I am remorseful about that. It's unfortunate that it took me to the age of 62 to figure all this out.
>
> I hope to get the chance to give back to my wife, my daughter and my grandchildren. It is also very important that I be able to give back to my society as well. My fear Judge Corrigan is that I may not have that chance if I die in prison due to Covid-19.

(Id.).

Notably, Defendant has comported himself well in prison. Defendant has completed numerous educational courses. (Doc. 118-2, Def. Ex. B). And importantly, Defendant has no disciplinary record. (Doc. 118-3, Def. Ex. C).

Age plays a role as well. Statistical evidence shows that age exerts a powerful influence on the recidivism rate, which declines as offenders get older. The Effects of Aging on Recidivism Among Federal Offenders, at 3, 23, United States Sentencing Commission (2017), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/201712 07_Recidivism-Age.pdf. At 62 years old, Defendant is in the second-to-lowest age category when it comes to the rate of recidivism and rearrest (the lowest risk category being those age 65 and up). Id. at 23.

Defendant's "mental and physical condition" further suggests that he is not a danger to another person or to the community. 18 U.S.C. § 3142(g)(3)(A). Given his numerous ailments, as well as the fact that he is largely reliant on a wheelchair because of knee and back problems, Defendant is unlikely to pose a risk to the public.

To the extent Defendant poses any risk of reoffending, the conditions of supervised release can control that risk. Among other things, Defendant would be required to report regularly to the probation officer, to truthfully answer any inquiries by the officer, and to submit to random visits, as well as any other conditions of supervised release specified in the judgment. (Doc. 73 at 3-4). The Court further intends to impose a term of community confinement in an approved residential reentry program as a condition of supervised release. Defendant will know that if he reoffends while on supervised release, he will be

subject to the revocation of supervised release and reimprisonment. As such, the Court finds that Defendant is not a danger to another person or to the community. U.S.S.G. § 1B1.13(2); 18 U.S.C. § 3142(g).

Likewise, for many of the same reasons discussed above, the Court finds that the factors set forth under 18 U.S.C. § 3553(a) support granting Defendant compassionate release. Defendant has been in state or federal custody for 11 years. As of the filing of the Supplemental Motion, Defendant had completed 81.5% of his statutory sentence. (Doc. 118 at 2-3; Def. Ex. A at 3). The Court believes that the length of Defendant's prison sentence has been sufficient to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public. 18 U.S.C. § 3553(a)(2). It is unlikely the public will need protection from further crimes of the Defendant. Given his circumstances and medical conditions, as well as the kinds of sentences available (such as supervised release with a period of community confinement), the Court finds that granting Defendant a sentence reduction will not disserve the statutory purposes of sentencing.

Defendant has put forth a release plan approved by the Probation Office: he will reside with the Prisoners of Christ (POC) Ministry, a community-based re-entry program that provides former prisoners with a range of services, including housing, clothing, food, substance abuse treatment, and resources for medical and mental health needs. Defendant appears to have a supportive

family, with whom he maintained contact throughout his incarceration, and who "look[s] forward to welcoming him home." (Doc. 118 at 4). Defendant's sister has also offered to subsidize some of the cost of his medical care.

In light of the foregoing, under the unique circumstances present, the Court finds that Defendant qualifies for compassionate release under 18 U.S.C. § 3582(c)(1)(A) and U.S.S.G. § 1B1.13. Accordingly, it is hereby **ORDERED:**

1. Defendant Daniel Vigil's Motion for Compassionate Release (Doc. 111) and Supplemental Motion (Doc. 118) are **GRANTED**.

2. Defendant's sentence of imprisonment is reduced to **TIME SERVED plus 10 days** so that his release date is **October 23, 2020**. If possible, Defendant should be quarantined before his release.

3. Upon Defendant's release from prison, he will begin serving his three-year term of supervised release. Defendant will be subject to the conditions of supervised release set forth in the judgment. (Doc. 73 at 3-4). The Court adds the following special condition pursuant to 18 U.S.C. § 3583(d) and U.S.S.G. § 5F1.1:

   **Community Confinement** – Defendant shall participate in, and successfully complete, the POC re-entry program.[6]

---

[6]   If the Probation Office determines that Defendant's participation in the POC program is no longer necessary or appropriate, it may move the Court to terminate that condition or add a period of home detention.

4. The terms of the judgment are otherwise unchanged.

**DONE AND ORDERED** at Jacksonville, Florida this 13th day of October, 2020.

TIMOTHY J. CORRIGAN
United States District Judge

lc 19

Copies:

Counsel of record
Defendant Daniel Vigil
Prisoners of Christ Ministry Program
Ms. Anita Vigil
Ms. Rita Behnke
United States Probation Office
United States Bureau of Prisons
Warden, FCC Forrest City Medium